**DISTRICT OF OREGON**
**F I L E D**
**April 04, 2013**
**Clerk, U.S. Bankruptcy Court**

Below is an Opinion of the Court.

RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re: ) Bankruptcy Case
) No. 09-30495-rld7
JOHN A. PAHL, )
) MEMORANDUM OPINION
Debtor. )

On April 2, 2013, I held an evidentiary hearing ("Hearing") on the Amended Final Application for Accountant's Compensation ("Amended Final Application") filed by Henderson Bennington Moshofsky, P.C. ("Henderson Bennington") as accountants for the bankruptcy estate of John A. Pahl ("Mr. Pahl"). Mr. Pahl appeared to object to the Amended Final Application.

In deciding this matter, I have considered carefully the testimony of Judith Bennington, a principal of Henderson Bennington, and the Amended Final Application itself, as well as arguments presented by the chapter 7[1] trustee, Kenneth S. Eiler ("Trustee"), and Mr. Pahl. I

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references
(continued...)

Page 1 - MEMORANDUM OPINION

further have taken judicial notice of the docket and documents filed in Mr. Pahl's main chapter 7 case, Case No. 09-30495-rld7, for the purpose of confirming and ascertaining facts not reasonably in dispute. Federal Rule of Evidence 201; In re Butts, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006). In addition, I have reviewed relevant legal authorities.

## Facts[2]

Mr. Pahl commenced this chapter 7 case by filing his bankruptcy petition on January 28, 2009. The Trustee is the duly appointed trustee in Mr. Pahl's bankruptcy case.

In his Schedules D, E and F, Mr. Pahl scheduled secured debt totaling $537,828, priority claims of $0, and undisputed unsecured claims totaling $87,530.16. After the chapter 7 case was filed, Mr. Pahl received a payment of $196,948.27 from the payoff of a promissory note. Eventually, $100,000 from that payoff was turned over to the Trustee, making Mr. Pahl's bankruptcy case one of those rarities in chapter 7, a solvent case--meaning that allowed unsecured claims in Mr. Pahl's bankruptcy case will be paid 100 cents on the dollar.[3] The order granting a discharge to Mr. Pahl was entered on May 18, 2009. See Docket No. 14.

---

[1](...continued) are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

[2] The background facts come primarily from documents on the court's docket and the narrative included in the Amended Final Application.

[3] Mr. Pahl attempted to limit the amount that he would have to pay to his creditors by filing objections to most claims filed in the case, requesting that they be disallowed in full, notwithstanding his schedules in which he averred that all scheduled unsecured claims were undisputed.

Page 2 - MEMORANDUM OPINION

The Trustee filed an application and order, that was entered by the court on September 17, 2010, to employ Henderson Bennington ("Application to Employ") with compensation not to exceed $2,000 to perform accounting services and prepare fiduciary tax returns. See Docket No. 37. The assignment was not without its difficulties. The Trustee filed an additional application and order, that was entered by the court on March 21, 2011, to employ Henderson Bennington ("Additional Application") with compensation not to exceed a further $1,000 for accounting services and preparation of fiduciary tax returns. See Docket No. 104. On April 7, 2011, Mr. Pahl objected ("Objection") to the Additional Application on the ground that "[t]his would bring the total projected accountant fees to $3,000.00 for services that could be obtained for less than 20% of this amount." See Docket No. 109.

The Trustee responded to the Objection, advising that Henderson Bennington had filed final fiduciary returns ("Initial Returns") for the estate, showing taxes of $8,404 due to the Internal Revenue Service ("IRS") and $7,854 due to the Oregon Department of Revenue ("ODR"), and had sent a final billing statement to the Trustee in the amount of $2,359.87. The Trustee further requested that the Objection be overruled and that Mr. Pahl be ordered to turn over an additional $10,000 forthwith so that administration of his bankruptcy estate could be completed. See Docket No. 112.

Mr. Pahl responded with a Petition to Disallow Administrative Expenses and Dismiss Case ("Petition to Dismiss") in which, among other things, Mr. Pahl alleged that:

> 2. Trustee has caused tax returns to be prepared after having had his accountants advised that debtor would not owe any such taxes. <u>Tax returns subsequently filed by debtor for tax year 2010 verify this</u>.
> . . .
> 4. Trustee's "accountant" prepared taxes that were, even if a tax return had been required, improperly prepared and failed to take advantage of significant allowable deductions.
> 5. Trustee's claimed fees include a percentage of the "fees" charged by the accountant. These fees are set at several multiples of the reasonable and ordinary fees charged by equally qualified accountants in this area. . . .

<u>See</u> Docket No. 122 (emphasis added).

The Trustee filed a response ("Response") to the Petition to Dismiss, including, among other things, the following statements:

> Initially, the Trustee would note that the debtor continues to assert, without evidence, that the estate is not liable to pay any taxes on the proceeds from a promissory note that was the subject of the Turnover Motion filed by the Trustee (Dkt #28) and later stipulated to by the debtor (Dkt #44). The Trustee's accountant will be present in court to detail as needed the necessity to file tax returns in this matter. <u>However, it is axiomatic that a transaction which paid the debtor in excess of $196,000 requires the filing of a tax return</u>.

<u>See</u> Docket No. 123 (emphasis added).

A hearing ("Dismissal Hearing") was held on the Additional Application, the Objection and the Petition to Dismiss, among other matters, on September 30, 2011. At the conclusion of the Dismissal Hearing, the court denied the Petition to Dismiss, provided some guidance as to the total amount of allowed unsecured claims and interest accrued thereon, and deferred consideration of final compensation for Henderson Bennington pending completion of their accounting work for the estate. The court further required Mr. Pahl to deliver copies of his 2005-2010

Page 4 - MEMORANDUM OPINION

tax returns to chambers in confidence for inspection by Ms. Bennington, without allowing her to make copies of the returns. See Docket No. 124. Mr. Pahl subsequently provided his tax returns for 2007, 2008, 2009 and 2010 for in camera review, and Ms. Bennington reviewed them. See Docket No. 131. The copies of his tax returns then were returned to Mr. Pahl. See Docket No. 132.

On October 11, 2011, Mr. Pahl filed an objection to Henderson Bennington's claim for compensation in the amount of $2,359.37, requesting that the claim be disallowed in full. See Docket No. 127. On the same day, the court entered an order advising that, "The court will take no action on the debtor's objection to the trustee's supplemental application to employ and compensate the accountant (#104) pending the filing of the accountant's request for final compensation." See Docket No. 128.

Mr. Pahl objected that the Initial Returns were incorrect as there were loss carry forwards which should have been used to offset the taxable income reported. After Ms. Bennington reviewed the copies of his tax returns that Mr. Pahl provided for in camera review, Henderson Bennington prepared amended fiduciary tax returns ("First Amended Returns") for the year ended February 28, 2011, incorporating net operating loss carry forwards. The First Amended Returns showed the estate as entitled to refunds of $1,231 from the IRS and $739 from the ODR.

> Mr. Pahl objected to these amended returns as they did not include the capital loss carry forward on the disposition of the beach house. It had been [Henderson Bennington's] understanding that the beach house was being built for Mr. Pahl's personal use.

Page 5 - MEMORANDUM OPINION

> After several talks with Mr. Pahl's accountant,
> receiving information from the accountant and a letter
> to Mr. Pahl requesting clarification on intent of
> whether this property was to be personal or investment
> [Henderson Bennington] prepared a second amended
> return ["Second Amended Returns"] for the year ended
> February 28, 2011. [Henderson Bennington] was not
> aware this property was 1031 exchange investment
> property the disposition of which further reduced the
> estate tax liability. The estate received a federal
> refund of $7,177.00 and state refund of $7,115.00.

Amended Final Application, Schedule A.

In the Amended Final Application, Henderson Bennington requested total compensation of $2,875.25 for professional accounting services and $12.50 in cost reimbursements, for a total of $2,887.50. At the Hearing, Ms. Bennington testified as to the amount of compensation requested, confirming and elaborating on the narrative included as Schedule A to the Amended Final Application. She further confirmed that, with the piecemeal receipt of information and documentation from Mr. Pahl and his accountants, the estate's final fiduciary returns had to be amended twice to get to final results. The Amended Final Application includes an itemization of time spent on work for Mr. Pahl's estate that I have reviewed.

Mr. Pahl's primary argument at the Hearing was that the Trustee and Henderson Bennington were told from day one by him and by his accountant(s) that no tax was owed on the $196,948.27 promissory note payoff. Therefore, they wasted time and money preparing fiduciary tax returns. He further argued that Henderson Bennington's hourly rates for accounting services were too high, without submitting any evidence as to what appropriate hourly rates should be.

Following the presentation of testimony and argument, I took

the matter under advisement.

## Jurisdiction

I have jurisdiction to decide this matter under 28 U.S.C. §§ 1334, 157(b)(1) and 157(b)(2)(A).

## Discussion

A. Standards for Approving Compensation to Estate Professionals

Under § 330(a)(1), after notice and a hearing, I am authorized to award compensation to estate professionals consistent with the following standards:

> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
> (B) reimbursement for actual, necessary expenses.

No issue has been raised by Mr. Pahl as to the $12.50 expenses for which Henderson Bennington requests reimbursement. So, the issues to be resolved focus on whether the professional accounting services performed by Henderson Bennington for the estate were necessary and whether the compensation they are requesting is reasonable in light of the services performed.

B. Necessity for Services and Reasonableness of Compensation Requested

"The majority of courts have determined the 'necessity' of particular services from the perspective of the time that the services were rendered, rather than based on hindsight after services had been performed." 3 Collier on Bankruptcy ¶ 330.03[1][b][iii] (Alan N. Resnick and Henry J. Sommer eds., 16th ed.), citing In re Krause, 155 F. 702 (S.D.N.Y. 1907).

Page 7 - MEMORANDUM OPINION

In this case, the estate received a $100,000 payment from a $196,948.27 promissory note payoff. The Trustee determined, and Henderson Bennington agreed, that in these circumstances, fiduciary tax returns needed to be prepared and filed for the estate before the estate could be closed. Mr. Pahl has argued early and often that the returns were not necessary because there was no tax owed. That statement, however vehemently expressed, is like, "The check's in the mail." Prudent trustees and estate professionals apply the principle perhaps most memorably stated by former President Reagan to such representations: "Trust, but verify." In fact, they are required to do so by the duties imposed upon them by the Bankruptcy Code. See, e.g., §§ 323 and 327.

Mr. Pahl never provided copies of his tax returns evidencing loss carry forwards to the Trustee. Those returns were only finally made available for in camera review by Ms. Bennington after issues between the Trustee and Mr. Pahl had been brought to a head at the Dismissal Hearing. Unfortunately, this was after the Initial Returns already had been prepared and filed. Once Ms. Bennington had the opportunity to review the tax returns that Mr. Pahl provided, Henderson Bennington prepared and filed the First Amended Returns, only to be confronted by Mr. Pahl's further objection that the returns were still wrong because they did not account for 1031 exchange property. Information with respect to Mr. Pahl's 1031 exchange position had not been provided previously to Henderson Bennington. After further communications with Mr. Pahl and his accountant(s)[4], Henderson Bennington prepared and filed the Second

---

[4] Mr. Pahl had an accountant in Tillamook, Oregon, and in cross-
(continued...)

Page 8 - MEMORANDUM OPINION

Amended Returns.

In these circumstances, it is unfortunate that the fiduciary tax returns had to be revised twice before they really were final, but the responsibility for that extra work rests with Mr. Pahl. If he had provided the Trustee with the documentation required to establish that, in fact, no taxes were owed on the funds received by the estate at the outset, some professional expense could have been avoided. However, based on the situation faced by the Trustee and Henderson Bennington as it unfolded, I find that the services performed by Henderson Bennington in preparing the Initial Returns and the subsequent First Amended Returns and Second Amended Returns were necessary.

The efforts expended by personnel of Henderson Bennington performing accounting services for Mr. Pahl's estate are itemized in detail in Schedule B to the Amended Final Application, which as I indicated above, I have reviewed. Mr. Pahl has not challenged that Henderson Bennington personnel actually performed the services set forth in the Schedule B itemization. Accordingly, I find that the services reflected on the Schedule B itemization actually were performed.

Finally, the question is whether the charges for the services performed by Henderson Bennington were reasonable. Recall that in the

---

[4](...continued)
examination of Ms. Bennington, he elicited an admission that she had spoken at some point with this accountant. He later hired an accountant in Woodburn, Oregon, with whom Ms. Bennington also spoke. According to Mr. Pahl, his change of accountants was necessitated by the fact that in his last meeting with the Tillamook accountant, the meeting ended with the accountant essentially throwing Mr. Pahl out of his office and advising Mr. Pahl that he was through performing services for him.

Page 9 - MEMORANDUM OPINION

1 Objection, Mr. Pahl argued, without evidence, that the estate accountant
2 fees of approximately $3,000 "could be obtained for less than 20% of this
3 amount." At the Hearing, Mr. Pahl argued that accountant fees of $280 an
4 hour were too high. It was pointed out to Mr. Pahl at the Hearing that
5 the highest hourly rate reflected in the Amended Final Application for
6 any Henderson Bennington accountant (Ms. Bennington) was $230 an hour.
7 (It is worthy of note that Ms. Bennington only billed 1.1 hours time at
8 $230 an hour. She billed 7.5 hours at $215 an hour and 2.1 hours at
9 $107.50 an hour.) Mr. Pahl never presented any evidence as to what
10 "reasonable" hourly accountant charges should be.

11 The hourly rates in the Amended Final Application range from
12 $107.50 to $230 per hour for accounting services. Based on my review of
13 applications for approval of compensation for accountants over the last
14 fifteen plus years of my service as a bankruptcy judge, I do not find
15 Henderson Bennington's billing rates unreasonable. I further find that
16 it is reasonable to apply a "lodestar" approach to awarding reasonable
17 compensation to Henderson Bennington in this case, as is customary
18 generally in the Ninth Circuit. See, e.g., Ballen v. City of Redmond,
19 466 F.3d 736, 746 (9th Cir. 2006). The lodestar method multiplies the
20 number of hours reasonably expended by the professionals by their
21 reasonable hourly rates. See, e.g., McGrath v. County of Nevada, 67 F.3d
22 248, 252 (9th Cir. 2006).

23 Applying that calculation to the time itemized by Henderson
24 Bennington in the Amended Final Application, I arrive at a total of
25 $2,875.25, which is the total amount requested for compensation by

Page 10 - MEMORANDUM OPINION

Henderson Bennington in the Amended Final Application.[5]

## Conclusion

Based on the foregoing recitation of background facts and the legal analysis applied to those facts, I conclude that it is appropriate to award final compensation and reimbursement of expenses to Henderson Bennington in the amounts of $2,875.25 fees and $12.50 expenses, for a total of $2,887.75. An order consistent with this Memorandum Opinion will be entered.

###

cc:     John A. Pahl
        Kenneth S. Eiler, Trustee
        Henderson Bennington Moshofsky, PC

---

[5] I confirmed with the Trustee at the Hearing that he was not going to renew his request that Mr. Pahl turn over any additional funds to the estate. The estate has enough money in hand to pay all allowed unsecured claims plus interest and all administrative expenses, whatever I rule in this matter. The issue for Mr. Pahl is how much, if anything, he gets back from the $100,000 he turned over to the Trustee.

Page 11 - MEMORANDUM OPINION